# THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| IN RE: ) | |
| ) | |
| WEIRTON STEEL CORPORATION, et al., ) | Case No. 03-1802 |
| ) | |
| Debtors. ) | Chapter 11 |
| ) | |
| ──────────────────────── ) | |
| ) | |
| KINDER MORGAN/PINNEY DOCK & ) | |
| TRANSPORT, LLC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Adv. Proc. No. 06-186 |
| ) | |
| MITTAL STEEL USA, INC., ) | |
| INTERNATIONAL STEEL GROUP, INC., ) | |
| and ISG WEIRTON, INC., ) | |
| ) | |
| Defendants. ) | |
| ──────────────────────── ) | |

## MEMORANDUM OPINION

Kinder Morgan/Pinney Dock & Transport, LLC ("Kinder Morgan"), filed this adversary complaint against International Steel Group, Inc., and ISG Weirton, Inc. (collectively "ISG"), the entities that purchased substantially all the assets of Weirton Steel Corporation (the "Debtor"). Mittal Steel USA, Inc. ("Mittal Steel"), is the successor in interest to ISG. Kinder Morgan seeks to recover about $523,000 from Mittal Steel and/or ISG based on an alleged failure to pay the remaining cure amount of an Iron Ore Handling and Storage Agreement that was allegedly assumed and assigned to ISG as part of ISG's purchase of the Debtor's assets.

On March 22, 2007, Mittal Steel filed a motion for a judgment on the pleadings, as amended on April 20, 2007, arguing that Kinder Morgan did not have a legitimate, contractual claim against it for the unpaid cure amount. Kinder Morgan responded to Mittal Steel's motion, and has submitted exhibits outside of the pleadings in this case that purport to demonstrate ISG's promise to pay Kinder Morgan the outstanding cure amount. Consequently, Kinder Morgan requests that the court transform Mittal Steel's motion to one for summary judgment pursuant to Fed. R. Civ. P. 12(c) and

56, as made applicable to this proceeding by Fed. R. Bankr. P. 7012(b) and 7056. In its reply, Mittal Steel objects to transforming this motion into one for summary judgment on the basis that consideration of the exhibits submitted by Kinder Morgan constitute parol evidence, which cannot be used to vary the terms of the express contract between the parties.

The court held a hearing in this adversary proceeding on March 26, 2007, in Wheeling, West Virginia, at which time the court afforded the parties time to submit additional briefing. That briefing is now complete, and for the reasons stated herein, the court will dismiss the adversary complaint filed by Kinder Morgan without prejudice because the court finds that it lacks subject matter jurisdiction to adjudicate this proceeding.

## I. STANDARD OF REVIEW

A motion for a judgment on the pleadings is brought pursuant to Fed. R. Civ. P. 12(c), as made applicable to bankruptcy proceedings by Fed. R. Bankr. P. 7012(b). The standard of review to be followed by the court in adjudicating a Rule 12(c) motion to dismiss is identical to that used to adjudicate motions for failure to state a claim under Rule 12(b)(6). *E.g.*, Fed. R. Civ. P. 12(h)(2) (providing that the defense of failure to state a claim on which relief may be granted as set forth in Rule 12(b)(6) may be raised "by motion for judgment on the pleadings . . . ."); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (stating that the court employs the same standards in adjudicating both a Rule 12(b)(6) and a Rule 12(c) motion). Taking the nonmoving party's allegations as true, dismissal is inappropriate unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

Pursuant to Fed. R. Civ. P. 12(c), "[i]f, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all materials made pertinent to such a motion by Rule 56."

## II. BACKGROUND

The Debtor filed its Chapter 11 bankruptcy petition in the Bankruptcy Court for the Northern District of West Virginia on May 19, 2003. Among the pre-petition assets of the bankruptcy estate is a February 9, 1998 Iron Ore Handling and Storage Agreement (the "First Agreement") executed

-2-

between the Debtor and Kinder Morgan. Among other terms, the First Agreement required that the Debtor move a minimum of 65% of its annual iron ore tonnage at the Lake Erie docks through Kinder Morgan's facility. Kinder Morgan's handling charge was $1.35 per gross ton for the first 800,000 tons, $1.13 per gross ton for the next 400,000 tons, and $0.93 per gross ton for any amount in excess of $1,200,000 gross tons. The Debtor had the right to terminate the First Agreement by giving Kinder Morgan 90 days written notice in the event that the Debtor was able to obtain delivery of its self unloader iron ore at a lower net cost than it could obtain under the First Agreement, and if Kinder Morgan refused to lower its fees. On April 21, 2003, the Debtor and Kinder Morgan extended the duration of the contract through December 31, 2007.

On February 26, 2004, the Debtor filed its motion to sell substantially all of its assets to ISG. (Document No. 1686 in Case No. 03-1802). The First Agreement was listed on Schedule 1(c) as an asset to be transferred by the Debtor. At the time, however, the Debtor owed Kinder Morgan $848,090 under the First Agreement, and as required by 11 U.S.C. § 365(b)(1)(A), the Debtor had to either cure the arrearage before assuming and assigning the First Agreement to ISG, or had to provide adequate assurance that the arrearage would be promptly cured.

To effectuate the assumption and assignment of the First Agreement to ISG, the Debtor, Kinder Morgan, and ISG executed a November 17, 2004 letter agreement (the "Second Agreement"), which provided terms more favorable to Kinder Morgan than those included in the First Agreement. For example, the Second Agreement Provides:

> In connection with its acquisition of the Weirton assets, ISG desires to take an assignment of the Contract. To this end, Weirton, ISG and KM agree as follows:
>
> 1. Subject to the terms of this letter agreement, KM consents to Wierton's assignment of the Contract to ISG pursuant to Section 365 of the United States Bankruptcy Code and the assumption of the contract by ISG.
>
> 2. Effective as of the Closing Date, Weirton hereby assigns and ISG hereby accepts assignment of the Contract and agrees to fully perform all of the terms, conditions, covenants, obligations, liabilities, and agreements to be kept and performed on the part of Weirton under the Contract on and after the Closing Date.
>
> 3. KM agrees that, except as set forth in this letter agreement, it shall not have

-3-

> any claim against ISG for Weirton's obligations under the Contract prior to the Closing Date. KM withdraws, waives, and releases any claim related to or arising under or in connection with the Contract filed against Weirton in Weirton's bankruptcy case or listed by Weirton in its Schedule of Liabilities.

(Document No. 33, Ex. 2 in Case No. 06-186).

The Second Agreement also modified the terms of the First Agreement such that ISG would be required to move a minimum of 80% (up from 65%) of its annual iron ore tonnage at the Lake Erie docks through Kinder Morgan's facility. The duration of the Second Agreement terminated on December 31, 2010, as opposed to December 31, 2007. Similarly, ISG's right to terminate the Second Agreement required 365 days advance written notice to Kinder Morgan of ISG's ability to obtain delivery of its self unloader iron ore at a lower net cost than ISG was able to obtain by performing the Second Agreement. Importantly, the contract rates in the Second Agreement increased over those applicable in the First Agreement:

> 4. Effective as of the Closing Date, ISG and KM agree to amend the Contract as follows:
>
> . . . .
>
> (c) Section 6(d): The rates shall be adjusted as shown below, until the increase portion adds up to the Cure Amount, at which time the rates will revert to the base plus escalation for each tonnage category:
>
> | Gross Ton | Base Rate | Surcharge | Total Rate |
> |---|---|---|---|
> | 0-800,000 | $1.35 | $0.10 | $1.45 |
> | >800,000- 1,200,000 | $1.115 | $0.15 | $1.265 |
> | >1,200,000 | $0.915 | $0.20 | $1.115 |

(Document No. 33, Ex. 2, in Case No. 06-186).

The Debtor's November 22, 2004 Seventh Omnibus Objection to Claims (Document No. 3022 in Case No. 03-1802) complements the November 17, 2004 Second Agreement. Pursuant to the Seventh Omnibus Objection, the Debtor related that ISG, as the purchaser of substantially all of its assets, had agreed to assume, and thereafter pay, perform, and discharge when due certain liabilities and obligations, including cure costs relating to certain executory contracts. More specifically, the Debtor listed Kinder Morgan's cure claim of $848,089.51 as a claim assumed by ISG and one that could be disallowed with regard to the Debtor's bankruptcy estate. When no objection was filed by Kinder Morgan, the court granted the Debtor's Claims Objection (Document No. 3065 in Case No 03-1802). In this adversary proceeding, Kinder Morgan and the Debtor

-4-

stipulated that Kinder Morgan's claims were disallowed against the bankruptcy estate, without prejudice to Kinder Morgan to seek payment of the cure amount from ISG. (Document No. 31 in Case No. 06-186).

According to Kinder Morgan, the meaning of the Second Agreement is manifest in an e-mail exchange between Mike Ritz, negotiating on behalf of ISG, and Lou Zimmerman, negotiating on behalf of Kinder Morgan. On April 20, 2004, Lou Zimmerman explained that Kinder Morgan's intention was to "lock up an agreement with ISG (for handling a supply of ore to the Weirton plant), to recover the prepetition amount (roughly $850K) by giving ISG value through services (rather than requesting a direct cure payment), and to avoid uncertainty of not having a contract for ISG or Kinder Morgan." (Document No. 33, Ex. 3 in Case No 06-186) (parentheticals in original). Mike Ritz responded on May 6, 2004, that the terms outlined in the April e-mail were okay with some modifications. More specifically, ISG wanted "a cap on the cure payments at two years or $800,000. . . . [and wanted] the contract extended to at least 2010 since [it was] buying the contract for $800,000 [it needed] some time to get value for the money [it was] spending." *Id.* Mike Ritz sent another e-mail on May 12, 2004 to summarize an earlier telephone conversation. Pursuant to that e-mail, the parties had reached an agreement as to the length of time required for notification of termination, the expiration date of the proposed Second Agreement, and to surcharge the ore handling prices until the pre-petition cure amount was paid. *Id.* In Lou Zimmerman's affidavit, he stated that Kinder Morgan had agreed that the cure amount could be paid out by ISG over time, and that "[t]here were never any discussions, negotiations, or agreements in connection with the [Second Agreement] that Kinder Morgan would only be paid the Cure Amount so long as services were required." (Document No. 33, Ex. 4 in Case No. 06-186).

In late 2005, ISG made a business decision to shut down its blast furnaces at its Weirton, West Virginia facility. As a consequence of that decision, ISG no longer needed Kinder Morgan's ore handling services at its Lake Erie docks. Kinder Morgan asserts that the unpaid cure amount is about $523,000.

### III. DISCUSSION

Mittal Steel argues that Kinder Morgan freely and knowingly waived its right to cure payments arising from any prior defaults by the Debtor under the First Agreement in exchange for

-5-

significantly increased payment terms. Importantly, Mittal Steel argues, the Second Agreement does not guarantee that Kinder Morgan will receive its cure amount; it only provides that Mittal Steel would use Kinder Morgan's facility and pay a surcharge so long as Kinder Morgan's services were required. Because the First and Second Agreements are clear and unambiguous, Mittal Steel urges the court to interpret the Agreements as written.

Kinder Morgan asserts that the only waiver it executed with regard to the pre-petition cure payment was the right to be paid up-front, agreeing instead to be paid over time by ISG. The only reason Kinder Morgan agreed not to respond to the Debtor's objection to its proof of claim was that it had been assured the cure amount would be paid by ISG, a right that was preserved in the Order disallowing its proof of claim. According to Kinder Morgan, the true intent of the parties is manifest in the series of e-mails leading up to the Second Agreement, and neither those e-mails, nor the language of the Second Agreement contain any statement concerning ISG's right to not pay the cure amount if it no longer required Kinder Morgan's services. Kinder Morgan argues that Mittal Steel has intentionally misrepresented the Second Agreement and it asks for sanctions.

### A. The "Cure" Requirement

As a condition to the assumption of the First Agreement, as modified in the Second Agreement, Kinder Morgan asserts that all of the Debtors' pre-petition defaults under the First Agreement had to be cured.

Section 365(b)(1) provides that "[i]f there has been a default in an executory contract . . . of the debtor, the trustee may not assume such contract . . . unless, at the time of assumption of such contract . . . the trustee – (A) cures, or provides adequate assurance that the trustee will promptly cure such default." Importantly, while a straight "cure" may require an immediate cash payment, "adequate assurance" of a cure allows for something other than an immediate cash payment. *E.g.*, *Concerto Software, Inc. v. Vitaquest Int'l, Inc.*, 290 B.R. 448, 453 (D. Me. 2003) ("Providing 'adequate assurance' of a prompt cure 'is a substitute for the taking of the action.' . . . [T]he parties agreed that the 'immediate cash cure[] would be waived and that the cure would take place over time.' Since Appellant was satisfied with the debtor's offer, it was within the discretion of the bankruptcy court to ratify the agreement upon notice and hearing.") (citations omitted); *In re Carlisle Homes, Inc.*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) ("The 'cure' or 'compensation' contemplated

-6-

by § 365(b)(1)(A) and (B) allows for something other than immediate cash payment."); 3 *Collier on Bankruptcy* ¶ 365.05[1][3][a] (Alan N. Resnick and Henry J. Sommer eds. 15th ed. rev. 2007) ("In each instance, 'adequate assurance' that the action will be taken is a substitute for the immediate taking of the action.... The term ... has some flexibility. In particular, because in an appropriate case it is possible for the cure or compensation for loss to be something other than immediate cash payment, adequate assurance may be of something other than the availability of cash to cure or compensate.").

A determination of what constitutes "adequate assurance" is a pragmatic one, and is based on the circumstances of each individual case. *See, e.g., In re Tama Beef Packing, Inc.*, 277 B.R. 407 (Bankr. N.D. Iowa 2002) ("Assurance is adequate if performance is likely; that is more probable than not."). Likewise, a determination of whether a cure is "prompt" is also case specific. *E.g., In re America the Beautiful Dreamer, Inc.*, No. 05-47435, 2006 Bankr. LEXIS 1371 at *3 (Bankr. W.D. Wash. May 18, 2006) ("Courts generally consider the following facts in determining whether the 'prompt cure' requirement is satisfied: (1) the debtor's past financial performance, (2) any inequitable acts by the non-debtor party, (3) harm or prejudice suffered by the non-debtor party resulting from past defaults and (4) the term of the contract or lease."); Risa Lynn Wolf-Smith and Wendy Chung Rossiter, *Executory Contracts: How Prompt is "Prompt?"* 23-1 Am Bankr. Inst. J. 1, 44 (Feb. 2004) ("Decisions concerning the promptness of cure under § 365, however, have varied, as courts have determined the issue based on the unique facts of each case.").

In this case, Kinder Morgan agreed to forego an immediate cash cure payment; instead, it opted to allow ISG to pay the amount of the Debtor's cure obligation over time through, inter alia, the surcharged ore handling rates reflected in the Second Agreement. Because of Kinder Morgan's consent to this arrangement, "adequate assurance" of a prompt cure, as required by 11 U.S.C. § 365(b)(1)(A), was present and the court could, and did, allow the assumption and assignment of the First Agreement. *E.g., Tama Beef Packing, Inc.*, 277 B.R. at 412 (finding that adequate assurance of a prompt cure was present when the lessor agreed to work out the cure payment with the bankruptcy purchaser outside of bankruptcy court). Accordingly, all the requirements of 11 U.S.C. § 365(b) were met and the Debtor's assumption and assignment of the First Agreement to ISG was properly approved by the court.

**B.     Post-Assumption and Assignment Breach**

Kinder Morgan alleges that Mittal Steel and/or ISG breached its duty to pay the Debtor's cure obligation in connection with the assumption and assignment of the First Agreement. In this regard, the classification of that purported obligation and the effect of the alleged breach on the Debtor's bankruptcy estate must be ascertained.

As stated by the United States Supreme Court, "[s]hould the debtor-in-possession elect to assume the executory contract . . . it assumes the contract *cum onere*, and the expenses and liabilities incurred may be treated as administrative expenses, which are afforded the highest priority on the debtor's estate." *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984). Accordingly, when a debtor assumes a contract by providing adequate assurance of a prompt cure, and when the debtor subsequently fails to make the cure payments as promised, the unpaid amount of the cure will remain as an administrative expense claim against the Debtor's estate. *E.g., Nostas Assocs. v. Costich (In re Klein Sleep Prods.)*, 78 F.3d 18, 35 (2nd Cir. 1996) (concluding that unpaid, post-assumption obligations become an administrative claim against the estate); 3 *Collier on Bankruptcy* ¶ 365.01[3][b][5] (Alan N. Resnick and Henry J Sommer eds. 15th ed. rev. 2007) ("[A] trustee or debtor in possession should proceed cautiously in electing to assume a contract or lease, since an assumption will have the effect of making the expenses and liabilities incurred expenses of administration.").

In this case, however, in allowing the assumption of the First Agreement, Kinder Morgan specifically waived its right to collect the cure amount from the Debtor. The Second Agreement provides that "KM withdraws, waives, and releases any claim related to or arising under or in connection with the Contract filed against Weirton in Weirton's bankruptcy case or listed by Weirton in its Schedule of Liabilities." (Document No. 33, Ex. 2, in Case No. 06-186). Consequently, Kinder Morgan waived any claim it had against the Debtor's estate to collect the unpaid cure amount. In fact, Kinder Morgan and the Debtor executed a stipulation dismissing the Debtor from this case on the basis that, "pursuant to the Omnibus Claims Order, KM's claims, including the Cure Amount, were disallowed without prejudice to KM to seek payment thereof from ISGW, a wholly owned subsidiary of ISG." (Document No. 28 in Case No. 06-186). Accordingly, ISG's alleged liability to pay the Debtor's cure obligation was purely a contractual covenant undertaken by ISG

-8-

in the Second Agreement. *E.g.*, 11 U.S.C. § 365(k) ("Assignment by the trustee to an entity of a contract or lease assumed under this section relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment.").

## C.     Subject Matter Jurisdiction

Concluding that Mittal Steel's alleged failure to pay the remaining cure amount is a contract based claim between it an Kinder Morgan, and concluding that the Debtor no longer has any obligation to pay the cure amount to Kinder Morgan, the court must examine its own subject matter jurisdiction to adjudicate the merits of this case, which is a contractual dispute between two non-debtor parties.

The district courts have original and exclusive jurisdiction of all cases under title 11 and original, but non-exclusive jurisdiction of all civil proceedings arising under, arising in, or related to a case under title 11. 28 U.S.C. § 1334. The district courts may refer § 1334's jurisdictional grant to the bankruptcy courts. 28 U.S.C. § 157(a). Controversies arise *in* title 11 when they "have no existence outside of the bankruptcy." *United States Trustee v. Gryphon at the Stone Mansion, Inc.*, 166 F.3d 552, 555 (3rd Cir. 1999). Claims arise *under* title 11 if the claims "clearly invoke substantive rights created by bankruptcy law." *Glinka v. Federal Plastics Mfg., Ltd. (In re Housecraft Indus. USA, Inc.)*, 310 F.3d 64, 70 (2nd Cir. 2002). A proceeding is *related to* a bankruptcy case when *"the outcome of that proceeding could conceivably have any effect on the estate. . . . [and] could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively). . . ." Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3rd Cir. 1984) (emphasis in original). *See also Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n.6 (1995) ("[W]hatever ["related to"] test is used, these cases make clear that bankruptcy courts have no jurisdiction over proceedings that have no effect on the estate of the debtor."); *New Horizon of N.Y. LLC v. Jacobs*, 231 F.3d 143, 151 (4th Cir. 2000) ("This court has adopted the Pacor related to test . . . .").

Accordingly, for a bankruptcy court to have jurisdiction over a cause of action, a case or controversy must exist that arises under, arises in, or is related to a case under title 11. Where a dispute concerns non-debtor parties, does not involve property of the estate, does not affect administration of the estate, or where the dispute will not affect payments to creditors under a confirmed plan, the bankruptcy court will generally not have jurisdiction under § 1334. *E.g.*,

*Concerto Software, Inc.*, 290 B.R. at 450-56 (concluding that the court lacked subject matter jurisdiction over a dispute between the purchaser of the debtor's executory contract and the other party to the contract when the purchaser committed an alleged post-assignment breach by failing to fulfill its assumed contractual duty to pay the cure amount required by § 365(b)(1)(A); the dispute was between non-debtor parties – it did not arise in or arise under title 11, and, post-assignment, any dispute between the parties was no longer related to the debtor's bankruptcy case).

In this case, the dispute over the non-payment of the cure amount, as set forth in the Second Agreement, like in *Concerto Software, Inc.*, is not one that arises in, arises under, or one that is related to a case under the Bankruptcy Code as defined by the case law interpreting 28 U.S.C. § 1334. More specifically, the dispute between Kinder Morgan and Mittal Steel is not one that "arises in" title 11; rather, it arises out of the contractual language used in the Second Agreement and it plainly is a dispute that exists outside the Bankruptcy Code. Similarly, the cause of action alleged by Kinder Morgan does not "arise under" the Bankruptcy Code because no substantive Bankruptcy Code right is being invoked. The court approved the assumption and assignment of the First Agreement, as modified by the Second Agreement, pursuant to § 365(b) of the Bankruptcy Code and no party is disputing the validity of that assumption and assignment. Kinder Morgan agreed to waive an immediate cash cure and to have the cure amount paid over time on the grounds that adequate assurance of a prompt cure was present, as manifested in the Second Agreement. Consequently, since Kinder Morgan was satisfied with the assumption and assignment of the First Agreement, as modified by the Second Agreement, "any dispute under the agreement is simply an action for breach of contract [and such a]n action for breach of contract does not . . . 'arise under' title 11." *Concerto Software Inc.*, 290 B.R. at 453-54.

Finally, the contractual dispute between Kinder Morgan and Mittal Steel is not one that is related to the Debtor's bankruptcy case because win, lose, or draw, the outcome of the proceeding will not have any impact on the Debtor's bankruptcy estate, or on the Debtor's rights, liabilities, options, or freedoms of action. The Debtor's involvement with the First and Second Agreements ended once the bankruptcy court entered the order approving the assumption and assignment of the First Agreement to ISG. *See, e.g.*, 11 U.S.C. § 365(k) (providing that the debtor has no obligation in the event that a contractual obligation is breached after the assumption and assignment of that

-10-

contract).

## IV. CONCLUSION

For the above-stated reasons, the court will dismiss the adversary complaint filed by Kinder Morgan without prejudice.[1] A separate order will be entered pursuant to Fed. R. Bankr. P. 9021.

ENTERED this 6 day of July, 2007

Ronald Pearson
United States Bankruptcy Judge

---

[1] Kinder Morgan also requested attorney's fees as a sanction for what it deems to be an intentional misrepresentation of the facts by Mittal Steel. The court, however, see no reason in this case to depart from the American Rule that each party is to bear its own costs.